IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF DALTON J. & SAMUAL L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DALTON J. AND SAMUAL L., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SHELLY B., APPELLANT, AND JOHN J. AND RODNEY L., APPELLEES.

Filed February 6, 2024.    Nos. A-22-684, A-22-685.

Appeals from the County Court for Dodge County: EDWARD H. MATNEY, Judge. Affirmed.

Kenneth Jacobs, of Hug and Jacobs, L.L.C., for appellant.

Pamela Lynn Hopkins, Dodge County Attorney, and Jocelyn J. Brasher for appellee State of Nebraska.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Shelly B. appeals the orders of the county court for Dodge County, sitting as a juvenile court, that terminated her parental rights to her two children, Dalton J. and Samual L. For the reasons that follow, we affirm.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

Shelly is the mother of Dalton and Samual. Dalton was born in 2009 and Samual was born in 2018. Dalton and Samual do not have the same fathers.

On May 20, 2019, Shelly was driving while intoxicated with Samual in the vehicle and was involved in a car accident. Shelly was arrested and charged with her third DUI, child neglect,

- 1 -

refusal to submit to a pretest, and refusal to submit to a test. Shelly pled guilty to the DUI charge, was placed on probation for 24 months, and had her license suspended for 15 years.

Beyond her history of driving while intoxicated, Shelly has a lengthy history of alcohol and drug abuse. Related to these problems, she has completed inpatient rehabilitation programs in 2010, 2011, and 2015. These treatments were in addition to her receiving individual therapy multiple times and completing several outpatient programs since 2010.

Shelly also has significant cognitive difficulties. These difficulties stem from a traumatic brain injury (TBI) she suffered as a 3-year-old when she was kicked in the head by a horse. While there are no medical records from this incident, Shelly claims the horse kick fractured her skull causing her to go into a coma. She also claims that she underwent three or four brain surgeries related to this accident. Despite the absence of medical documents confirming this injury, a clinical psychologist determined that Shelly's deficits supported the fact that she suffered a TBI as a child.

Because Samual was in the vehicle when Shelly was arrested in May 2019, Dalton and Samual were placed in the emergency temporary custody of the Nebraska Department of Health and Human Services (DHHS). On May 28, the juvenile court held a protective custody hearing and ordered the children to remain in the temporary custody of DHHS and excluded Shelly's home as a placement. The children were then placed in a kinship foster home with Shelly's ex-boyfriend and his wife, Darren G. and Laura G. The children were placed with Darren and Laura because Darren had a long-standing positive relationship with Dalton.

On June 14, 2019, the State filed separate petitions to adjudicate Dalton and Samual as being within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). On June 26, Shelly admitted to the allegations in the petitions and the court adjudicated the children as being within the meaning of § 43-247(3)(a).

On March 8, 2021, after Shelly demonstrated improvements in her life, she was reunified with Dalton and Samual. However, on July 28, DHHS received an intake where a neighbor reported that they witnessed Samual unsupervised outside around three times a week, with the most recent occurrence happening the previous night. Around this time, DHHS also obtained reports that Shelly was drinking alcohol and possessed a handgun. Due to these safety concerns, on July 30, the children were removed from Shelly's care and placed in the emergency temporary custody of DHHS. After their removal, Dalton and Samual were placed with Darren and Laura where they have remained ever since. On August 30, due to continued hostile communications from Shelly, Darren and Laura obtained a harassment protection order against her.

On September 25, 2021, Shelly was arrested for violating the protection order. Due to her acquiring new criminal charges for violating the protection order, Shelly's probation was revoked, and she was sentenced to jail. She was incarcerated from November 12, 2021, until February 4, 2022. After being released from jail, Shelly was arrested for her fourth DUI in late February 2022. That charge was still pending at the time of her termination hearing.

## 2. TERMINATION HEARING

On March 9, 2022, the State filed separate supplemental petitions to terminate Shelly's parental rights to Dalton and Samual. The State alleged that Dalton and Samual came within the meaning of Neb. Rev. Stat. § 43-292(2), (4), (5), (6), and (7) (Reissue 2016) and that terminating Shelly's parental rights was in their best interests. Shelly entered a denial to both petitions. The

termination of parental rights hearing was held over the course of multiple days in July and August 2022. Several witnesses testified on behalf of the State and Shelly testified in her own defense.

(a) Testimony of DHHS Caseworkers

Jack Leonard testified at the hearing and was the caseworker that managed Shelly's case from May 2019 until September 2019. He explained that throughout his time working with Shelly, one of the main barriers in her case was the impact her TBI had on her memory and behavior. Shelly often forgot dates which led to her missing appointments and supervised visits. The volume of missed appointments led to the agency that transported her to visitations with Dalton and Samual refusing to work with her. There were also issues with Shelly's behavior toward the visitation workers. Leonard received multiple reports from the workers that she yelled at them throughout the visits. Because of this behavior, Dalton refused to participate in the supervised visits. Leonard reported that Dalton did not like Shelly screaming and yelling at the visitation workers, making negative comments about Darren and Laura, and generally did not like seeing Shelly "emotionally escalated on a routine basis." Leonard's involvement in the case ended after Shelly told her then boyfriend that she was going to sleep with Leonard. Shortly after this was brought to Leonard's attention, he was transferred from the case.

Heather Schultz testified at the hearing and was the caseworker that managed Shelly's case from December 2019 until June 2020. Schultz expressed that a lot of the communication she had with Shelly was "done in anger" because Shelly was "very upset" about being involved with DHHS. Schultz described that Shelly's behavior negatively impacted her progression toward reunification and also negatively impacted Dalton and Samual. When Schultz talked with Dalton about the visits with Shelly, he would become upset, cry, and become argumentative. Overall, she testified that reunification with Shelly was not in Dalton and Samual's best interests.

Jessica Fetrow testified at the hearing and was the caseworker who managed Shelly's case from June 2020 until January 2021. Fetrow explained that Shelly constantly complained about her case and struggled with boundary issues. On some occasions, Shelly sent roughly 30 text messages to Fetrow overnight that did not pertain to her case. However, Fetrow reported that Shelly made progress while she worked with her. Shelly accepted Fetrow's redirections and was eventually allowed to have unsupervised visits with the children beginning in September 2020. Also in September 2020, Shelly received her driver's license back with the stipulation that an ignition interlock system be installed in her vehicle. Fetrow reported that when she left Shelly's case, Shelly had made positive progress in her case plan goals.

Veronica Yebra testified at the hearing and was the caseworker who managed Shelly's case from January 2021 until September 2021. With Shelly progressing in her case plan goals, on March 8, 2021, Dalton and Samual were reunified with her. At that point, as Shelly was making progress, Yebra recommended she participate in intensive family reunification (IFR), which she did from March 2021 until June 2021.

However, despite Shelly's progress, Yebra maintained some concerns. Once the children were reunified with Shelly, Dalton refused to engage with Yebra during check-ins, spent most of his time playing video games in his room, and had attendance and poor grade issues at school. In regard to Samual, Yebra described him as being "chaotic." During visits, Samual did not listen to Shelly, screamed and covered his ears, and constantly attempted to run away from her. There were

also concerns regarding Shelly's sobriety. Shelly's probation officer informed Yebra that Shelly might still be using drugs or alcohol. This aligned with Yebra noticing that during some visits Shelly seemed more agitated, had bloodshot eyes, and slurred her speech.

As Yebra continued to work with Shelly, their relationship soured. Yebra described Shelly as unstable, explained that she refused to take accountability for her actions, and summarized their interactions as having "a lot of blame [and] a lot of hate." Additionally, Shelly sent Yebra text messages that were "very overwhelming [and] very disturbing." In one group message that included Dalton, Shelly made a comment about putting a bag over Dalton's biological father's head and shoving a gun up his rectum. Shelly also sent a picture to Yebra of Shelly wearing a long black wig, seemingly to look like Yebra, with an accompanying message: "Who does this look like? Veronica." Another text message contained a photo of Shelly pointing a handgun at the camera. Additionally, after one visit, Shelly blocked Yebra's car and refused to move. On another occasion, Shelly followed Yebra to a nearby gas station.

In early July 2021, shortly after being reunified with Dalton and Samual and completing IFR, Shelly made the decision to leave them with Darren and Laura while she went to Oregon for two weeks. Shelly asked Yebra if she could go, and Yebra expressed that she thought it was a poor choice for Shelly to leave the state so soon after reunifying with Dalton and Samual. However, Shelly proceeded to go on the trip anyway.

In July 2021, Yebra received a report that Shelly was not properly supervising Samual. On July 28, a neighbor reported that Samual had been alone in a parking lot at 10 p.m. the night before. The neighbor reported that Samual was alone for 6 or 7 minutes before Shelly found him. This was not the first time this neighbor had seen Samual unsupervised outside; they reportedly saw him alone outside around three times per week. As a result, on July 30, Dalton and Samual were removed from Shelly's home and placed with Darren and Laura. Notably, Dalton had already been staying with Darren and Laura for a large portion of the summer.

Following the children being removed from her home, Shelly's progress regressed. Yebra reported that Shelly was doing the "very, very bare minimum" to meet her case plan goals in regard to visitation. Also, around this time, Dalton expressed that he was afraid of Shelly and did not want to return to living with her. Dalton reported that Shelly hit Samual, made him blow into her ignition lock system, and that she was using "green stuff" that "made her feel loopy." Dalton also reported that Shelly had a gun which Samual had gotten ahold of on one occasion. Further, Dalton explained that Shelly had a "kill list" that included Yebra's name. Based on these concerns, Dalton was afraid of visiting Shelly and did not want to live with her.

To make matters worse, in late August 2021, Shelly's probation officer received a report from Dalton's biological father that Shelly was drinking alcohol again. Due to these reports, Shelly had to do a drug and alcohol screening which came back positive for alcohol. After this positive test, Shelly admitted that she was drinking.

In September 2021, Yebra requested to be taken off Shelly's case because it was taking a toll on her mental health. She felt intimidated by Shelly and was concerned by the text messages she was receiving. Overall, Yebra indicated that she did not believe the children were safe with Shelly.

Ashley Starostka testified at the hearing and was Shelly's case manager from September 2021 until March 28, 2022. Upon taking over the case, Starostka experienced many problems with

Shelly. In September 2021, Shelly failed to show up to two scheduled visits with Dalton and Samual. Following these two no-shows, Dalton refused to participate in future visits and has not participated since. On September 25, Shelly was arrested for violating Darren and Laura's protection order against her. On September 29, Shelly tested positive for opiates. Because Shelly refused to sign release authorizations for Starostka to access her medical records, Starostka was never able to confirm which medications Shelly was prescribed and whether any of them were opioids.

In October 2021, Shelly missed more supervised visits. Despite having the same visitation schedule for the prior 2 months, Shelly forgot when the visits were and complained that she did not understand the schedule. Throughout the month of October, Shelly only attended 50 percent of the visits offered to her.

Also in October 2021, due to the ongoing concerns of substance abuse, Shelly completed a co-occurring evaluation. This evaluation recommended she attend an inpatient rehabilitation program. Shelly refused to participate in an inpatient program claiming that she did not need the treatment. As such, she also refused to participate in individual therapy.

On October 29, 2021, Shelly's probation was revoked, and she was sentenced to a period in jail. She remained in jail from November 12, 2021, until February 4, 2022. After Shelly was released from jail, she completed another co-occurring evaluation. That evaluation also recommended that she participate in an inpatient treatment program. However, Shelly continued to deny the need for treatment.

In February 2022, with Dalton still refusing to participate in visits, Shelly had in-person supervised visitations with Samual. During these visits, Shelly struggled with appropriate communication, levels of supervision, and was easily distracted. When Shelly got distracted, Samual climbed on top of counters and sometimes left the house. Additionally, Starostka had concerns about the way Shelly treated her and other workers and thought that Shelly might still be using alcohol or drugs. Then sometime in late February, Shelly was arrested for her fourth DUI. Starostka reported that throughout the time that she managed Shelly's case, Shelly did not make any positive behavioral changes nor had she made any progress in her case plan goals.

(b) Testimony of Family Support Workers

Nicole Radtke testified at the hearing and provided the IFR services to Shelly from March 2021 until June 2021. Radtke reported that most of Shelly's issues boiled down to communication problems with her either canceling sessions or forgetting when they were scheduled. When visits did occur, Radtke reported that Shelly required redirection and help to refocus during most sessions, but was only able to successfully refocus approximately 30 percent of the time. However, Radtke testified that toward the end of Shelly receiving IFR services, she demonstrated very good progress. She was more attentive toward Samual, her home became less chaotic, and she was better able to manage her finances and to follow a schedule.

Katie Tomky testified at the hearing and was the family support worker on Shelly's case from February 2022 until April 2022. Tomky also worked with Radke to provide the IFR services to Shelly from March 2021 until April 2021 and provided Shelly's virtual visitation services in December 2021 and January 2022.

During the period Tomky provided family support services to Shelly, Tomky believed that Shelly had become angrier toward the situation. While providing these services, Shelly sent Tomky numerous strange text messages late at night that did not pertain to the case. In one of these messages, Shelly threatened to call child protective services on Tomky to have her children removed. Tomky stopped providing family support services in April 2022 because no progress had been made and Shelly told Tomky that she no longer wanted the services.

(c) Testimony of Visitation Workers

Tonya Bauman testified at the hearing and worked as a manager for an agency that supervised Shelly's visits from December 2019 until March 2020. Bauman's agency quit supervising Shelly's visits because Shelly was difficult to work with and refused to cooperate with the redirections provided to her. Shelly alleged that the visitation workers stole from her, assaulted her, were not doing their jobs, and did not provide her with the necessary resources. Shelly also claimed that at one point one of the workers dragged her from their vehicle after a visit ended. Shelly's problems were so consistent that Bauman's agency required two workers to supervise Shelly's visits before the decision to terminate her services was made.

Additionally, the visitation workers had a problem with Shelly's attitude. When Shelly was not angry, she was "almost manic happy," but then something would go awry and she would become "very angry, very quickly." Multiple supervised visits ended early due to Shelly's behavior. After one visit ended early, Shelly left a voicemail on one of the workers' phones at 5 a.m., where she complained about how awful and unprofessional the workers were. Also in this voicemail, Shelly threatened she was going to report the agency to the local news station.

Bauman also discussed her concerns about Dalton and Samual's emotional safety. During visits, Dalton was often tasked with taking care of Samual. Shelly asked him to entertain Samual, get him food, and put him in charge of monitoring Samual's general safety. Additionally, Shelly often made promises to Dalton and Samual that she never kept. It came to the point where Dalton cried throughout many of the visits and withdrew from participating in the activities. The false accusations and Shelly's lack of progress led to Bauman's agency terminating their services with Shelly in March 2020.

Miranda Bowen testified at the hearing and was a visitation worker who supervised Shelly's visits from February 2022 until April 2022. Because Dalton was refusing to participate in visits throughout this period, Bowen only had contact with Samual. Bowen testified that Shelly's erratic behavior was a consistent theme of her visits. On several occasions, Shelly pulled out all of her documentation on the case, showed Bowen text messages from other workers, and was generally unable to let the conversation end. Toward the end of Bowen's involvement, Shelly sent Bowen odd text messages that Bowen described as "rants." Bowen also reported that Shelly offered her $10,000 to testify on her behalf at the termination hearing. Bowen stated Shelly's supervised visits ceased in April 2022 because of trouble with transportation.

(d) Testimony of Shannon Travis

Shannon Travis testified at the hearing and was Shelly's probation officer from August 2020 until October 2021, when her probation was revoked. Shelly had multiple violations throughout her time on probation. In December 2020, Shelly was sanctioned for using a financial

device that did not belong to her. In May 2021, Shelly was charged in Dodge County with theft for shoplifting. This prompted a motion to revoke Shelly's probation, however, that proceeding was not held until October.

After acquiring the theft charge, Travis reported that Shelly was doing well on probation. But this soon changed after Dalton and Samual were removed in July 2021. At the end of August, Shelly tested positive for alcohol. On September 29, Shelly tested positive for an opiate and was exhibiting increasingly erratic behavior. Shelly sent Travis text messages containing strange videos, tried to involve Travis in her DHHS case, and got increasingly upset with Travis. Travis described the "nonstop" and "harassing" text messages she received from Shelly which numbered from 65 to 75 messages a day. Shelly was then arrested for violating the protection order in October. Due to the new criminal charge and Shelly's strange behavior, Travis recommended Shelly's probation be revoked.

(e) Testimony of Counselors

Dr. Colleen Conoley testified at the hearing and is a clinical psychologist. In relation to Shelly's prior involvement with DHHS, Conoley had completed a neuropsychological evaluation of Shelly in August 2015. Conoley then performed Shelly's parenting capacity assessment from July to October 2020.

Conoley performed the neuropsychological evaluation in 2015 after the juvenile court ordered Shelly to undergo an assessment. Conoley learned that Shelly suffered from anxiety and panic and had considerable memory problems that Shelly attributed to her TBI. Conoley concluded that Shelly's "global functioning" was low which indicated "severe limitations in abstract thinking and novel problem-solving." Shelly's working memory was also measured to be below average or "borderline impairment." Essentially, these results meant that Shelly struggled with learning new things, staying focused when presented with complex tasks, switching in between tasks, and accessing memories in unfamiliar ways. Shelly's TBI also led her to being "highly susceptible" to "confabulation" which is a frontal lobe injury that leads people to intermingle false and valid memories. Because most of Shelly's problems were attributed to her TBI, Conoley stated that there was no treatment available to reverse those deficits. Instead, Shelly's treatment was limited to mitigating the effects of her deficiencies.

Conoley conducted a parenting assessment with Shelly from July to October 2020. After conducting this assessment, Conoley noted that Shelly was easily distracted, struggled with her emotions, and had trouble disengaging when she became upset. Additionally, Shelly struggled with self-analyzing her behaviors. Conoley concluded that Shelly's cognitive issues "put her children at risk" and made it difficult for her "to sustain the necessary level of attention to properly engage with [Samual] and provide the adequate level of vigilance for supervision."

Dr. Eric Snitchler testified at the hearing and was the clinical psychologist who performed a psychological evaluation of Dalton in March 2020. Dalton informed Snitchler that he did not want to participate in visits with Shelly or return to living with her. Instead, Dalton expressed that he wanted to remain with Darren and Laura.

### (f) Testimony of Darren and Laura

Darren and Laura also testified at trial. Darren generally overviewed his relationship with Shelly and Dalton. He expressed that after his romantic relationship with Shelly ended, he was concerned for Dalton's safety. Due to this, he tried to remain in contact with him and form a relationship. This involved Dalton often staying with Darren for weeks or even months at a time.

Even after Dalton and Samual were reunified with Shelly in May 2021, Dalton continued to live with Darren and Laura for several weeks of that summer. Darren and Laura reported that Dalton stayed with them from approximately the middle of May until July 4, when he then stayed with Shelly for only a few days before returning to their home. Then in early July, Samual also stayed with them for approximately 2 weeks while Shelly took a vacation to Oregon. Darren reported that he has a strong bond with the children, and they are doing well in his home.

Laura also provided more insight into why they felt the need to get a protection order against Shelly in August 2021. Laura stated that Shelly was calling them at all hours of the day and night and sent them verbally abusive, threatening, and intimidating messages and voicemails. The final straw before seeking the protection order was when Shelly sent them a photo depicting a child with a rifle with an accompanying message that stated, "Let's go get Dalton."

### (g) Testimony of Shelly

Shelly also testified at the hearing in her own defense. Shelly generally outlined her problems with substance abuse and explained that she had previously participated in several inpatient programs, with the most recent one occurring in 2015. Since she last participated in an inpatient program, she had received three recommendations from various counselors to participate in another inpatient program. However, despite these recommendations, Shelly did not believe she needed inpatient treatment.

Shelly also denied many of the accusations made in the State's petitions. She claimed that she never neglected to care for either Dalton or Samual and that she never pushed any parental obligations for Samual on to Dalton. Shelly also claimed that the last time she used alcohol was in August 2021, even though she was arrested for DUI in February 2022.

Shelly also contested Darren and Laura's assertions that Dalton stayed with them for an extended period during the summer of 2021. Initially, she claimed that she never sent Dalton or Samual to stay with Darren and Laura during the period they were reunified with her. However, after a brief recess, she stated that Dalton only stayed with them for a couple days over Memorial Day weekend, a couple of days over Fourth of July weekend, and then both children stayed with them in early July for approximately 10 days while she was in Oregon.

Generally, Shelly's testimony illustrated that it was difficult for her to focus. Her answers often veered off into unresponsive stories and contained irrelevant and superfluous details. This resulted in multiple instructions by the attorneys and judge to only answer the questions asked.

### (h) Juvenile Court's Order

On September 2, 2022, the juvenile court issued a separate order for each child finding that the State proved each of its allegations by clear and convincing evidence, in that, Dalton and Samual were children as defined by § 43-292(2), (4), (5), (6), and (7). Additionally, it found that

terminating Shelly's parental rights was in the best interests of Dalton and Samual. Shelly now appeals those orders. We have consolidated the two appeals for purposes of our review.

## III. ASSIGNMENT OF ERROR

Shelly assigns that the juvenile court erred by finding that termination of her parental rights was in the best interests of Dalton and Samual.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jaydon W. & Ethan W.*, 25 Neb. App. 562, 568, 909 N.W.2d 385 (2018).

## V. ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must first find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and second that termination is in the child's best interests. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id.*

Shelly concedes that the statutory ground under § 43-292(7) was met. However, for the sake of completeness, we find the State provided clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months as required by § 43-292(7). The look-back period to determine the existence of the statutory basis under § 43-292(7) of 15 or more months of the most recent 22 months is to be determined as of the date the petition or motion for termination of parental rights is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). The petitions to terminate were filed on March 9, 2022. Twenty-two months prior to that was May 9, 2020. Dalton and Samual were removed from the family home on May 20, 2019, reunified with Shelly on March 10, 2021, and then removed again on July 30, 2021. Accordingly, when the petitions to terminate were filed, Dalton and Samual had been in an out-of-home placement for 17 months of the most recent 22 months.

We now consider whether it was in Dalton and Samual's best interests to terminate Shelly's parental rights. A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

In determining whether a parent is unfit, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* As children cannot and should not be suspended in foster care or be made to await uncertain parental maturity, when a parent is unable

or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. See *In re Interest of Alec S., supra*.

We find that Dalton and Samual's best interests require the termination of Shelly's parental rights. Shelly's cognitive deficits, erratic behavior, and failure to address her substance abuse problems are detrimental to her children's well-being and have negatively affected her relationships with them. Given the number and prolonged nature of Shelly's deficiencies, we believe it is unlikely that she will be capable of or willing to rehabilitate herself within a reasonable period of time.

While we do not find that Shelly's cognitive deficiencies, alone, merit the termination of her parental rights, her continued struggles with managing the effects of her deficiencies demonstrate that she is unfit to parent Dalton and Samual. Shelly's TBI causes deficits related to her "global functioning," "executive functioning," and "working memory." These problems severely limit her abstract thinking, focus, problem-solving skills, ability to learn, and her ability to regulate her behavior and emotions. Her injury also poses challenges for her to properly interpret reality, by making her "highly susceptible" to intermingling false and real memories.

Shelly's deficits created barriers to her progressing in her case plan goals and impacted her ability to provide the necessary support for her children. Dalton and Samual's second removal was primarily prompted by reports that Samual was left unsupervised outside on multiple occasions. Since their second removal, there have been further reports that Shelly continues to struggle with properly supervising her children. Even when she was able to physically supervise them, she was prone to distractions. On multiple occasions, instead of taking care of Samual and Dalton, Shelly was more interested in complaining about her case with DHHS. Shelly's poor ability to focus led to caseworkers having concerns about her ability to supervise Samual and Dalton at the same time.

Additionally, Shelly's poor memory was a consistent theme in the administration of her case. Shelly constantly forgot about appointments and visits to the point where her inconsistencies led to transportation services refusing to schedule with her. These missed appointments ultimately impacted Shelly's relationship with Dalton, culminating in his refusal to participate in visits. Dalton now expresses that he does not want to communicate with Shelly and has no interest in living with her.

Given the nature of Shelly's TBI, there is no treatment available to cure her deficits. Instead, Conoley stated that Shelly's treatment options were limited to the mitigation of her deficiencies. Although Shelly exhibited positive improvement in her parenting skills prior to her reunification with Dalton and Samual in March 2021, those skills regressed, and Shelly now fails to display ongoing improvement. As Shelly's erratic behavior and memory problems remained a constant throughout the administration of her case, we find that her attempts to mitigate her deficiencies have been, and are likely to remain, unsuccessful.

Shelly's erratic behavior was also a consistent source of problems. On different occasions, Shelly accused DHHS caseworkers and visit supervisors of not providing the requisite services, of stealing from her, and dragging her from their vehicle. On some occasions, Shelly's behavior became confrontational and intimidating. She threatened to call child protective services on Tomky, sent a picture of her holding a gun to Yebra, threatened to call the local news on Bauman's visitation agency, and sent multiple threatening messages to Darren and Laura. These behaviors distracted Shelly from focusing on her case plan goals and impacted her relationships with

caseworkers, visitation workers, and family support providers. Shelly's behavior led to the transfer of two caseworkers, the early termination of many supervised visits, Darren and Laura filing a protection order against her, and Bauman's visitation supervision agency refusing to work with her.

Additionally, we find it noteworthy that soon after being reunified with Dalton and Samual in March 2021, Dalton lived with Darren and Laura for an extended period of time. Even disregarding the dispute as to how long Dalton stayed with them during the summer of 2021, it is uncontested that Shelly left both children with Darren and Laura for approximately 10 days while she took a vacation to Oregon. This decision raises questions regarding Shelly's decision making and commitment to parenting.

Another ongoing concern is Shelly's problems with substance abuse. Shelly has struggled with substance abuse since at least 2010. To help address these issues, Shelly received multiple avenues of treatment. However, despite these treatments Shelly continues to display an inability to manage her addictions.

Shelly was charged with her third DUI in May 2019, which prompted the initial removal of Dalton and Samual. Following the second removal of Dalton and Samual in July 2021, Shelly tested positive for alcohol and admitted to drinking. This aligned with reports received by her probation officer that she was drinking again and Yebra's observations that she appeared intoxicated during some of her visits. Since testing positive for alcohol in August 2021, Shelly displayed ongoing problems related to her drinking which culminated in her receiving her fourth DUI in February 2022. This fourth DUI charge was acquired mere weeks before the State filed the supplemental petitions to terminate her parental rights and 3 months before the termination proceedings began.

Beyond Shelly's seeming inability to cease drinking and driving, Shelly's lack of recognition for further substance abuse treatment presents significant concerns. Shelly has received multiple recommendations that she participate in another inpatient program to address her substance abuse problems. The two most recent recommendations were in October 2021, before she was incarcerated, and February 2022, following her release from jail. Both times, Shelly denied the need for treatment. Even after the receipt of her fourth DUI charge in February 2022, Shelly testified at the termination hearing that she did not believe she needed inpatient treatment. This repudiation demonstrates an unwillingness to take accountability for her actions and a reluctance to remedy the deficiencies presented by her substance abuse.

Shelly's various issues not only create risks for Dalton and Samual but have also harmed her relationship with Dalton. Prior to being reunified with Shelly in March 2021, Dalton expressed to Snitchler that he did not want to talk about Shelly nor live with her. After the reunification, Dalton was severely disengaged. Tomky reported that while she provided IFR services, Dalton locked himself in his room and refused to interact with her. Yebra similarly reported that during her visits Dalton refused to engage and spent the entire time playing video games in his room.

After Dalton and Samual were removed for the second time, Dalton expressed that he was afraid of Shelly and did not want to live with her. Around this time, he refused to participate in the supervised visits. When Starostka attempted to convince him to participate, he expressed that he did not trust Shelly. Starostka testified that when she brought up Shelly, "you could physically see the trauma response" because Dalton "would curl up" and "shut down."

Because Shelly has demonstrated that she is unable to mitigate the effects of her TBI, cease from behaving erratically, and properly address her substance abuse problems, we conclude that Shelly is unfit to perform the reasonable obligations necessary in child rearing and is unable or unwilling to rehabilitate herself within a reasonable period of time. Because Dalton and Samual should not be suspended in foster care indefinitely and be made to await Shelly's uncertain parental maturity, their best interests require the termination of her parental rights.

## VI. CONCLUSION

For the foregoing reasons, we affirm the juvenile court's termination of Shelly's parental rights to Dalton and Samual.

AFFIRMED.